**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ATLAS MICROFILMING, DIVISION OF SERTAFILM, INC., Respondent.**

**No. 83–3548.**

United States Court of Appeals, Third Circuit.

Argued Sept. 12, 1984.

Decided Jan. 31, 1985.

William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Howard E. Perlstein, Abby Propis Simms (Argued), N.L.R.B., Washington, D.C., for petitioner.

Daniel C. Cohen (Argued), Jeffrey L. Braff, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for respondent.

Before ADAMS, HIGGINBOTHAM, and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

This case arises on the application of the National Labor Relations Board (Board) for enforcement of an order directing the company to cease and desist from the conduct proscribed by Sections 8(a)(1), (3), and (5) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1), (3) and (5) (1982), to bargain with a union that had obtained a card majority, and to reinstate and make whole an employee found to be discriminatorily discharged.

Atlas Microfilming (Company), to whom this order is directed, is in the business of photographing commercial and hospital records and converting them into microfilm. In mid-September of 1980, the United Labor Unions, Local 862 (Union) began an organizing drive that was successful in securing signed authorization cards from a majority of the employees. On October 10, the Union demanded recognition, but the Company refused. An election was then scheduled for November 26. During the campaign, the Company engaged in the conduct which is the basis for the Board's findings of unfair labor practices. The Union lost the election by a 42–39 vote.

The Union filed election challenges and unfair labor practice charges which were consolidated for a hearing that took place in July 1981. The Administrative Law Judge found that the unfair labor practices made a fair election impossible on November 26. He further found that "a second election would be met with a new wave of unfair labor practices," and recommended a bargaining order as approved in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969). The ALJ also found that the company had discriminatorily discharged Rose Bud Fleming because of her known or suspected union activity. The Board affirmed the ALJ decision in all relevant respects. 267 N.L.R.B. 682 (1983).

Before this court, the Company urges three sets of objections directed to the bargaining order. First, Atlas argues that the facts do not support the Board's finding that it violated the Act. Second, it argues that even if it violated the Act, the violations do not justify a bargaining order. And third, on a motion to remand, Atlas argues that it should be permitted to introduce evidence concerning its January 1, 1984 move to new facilities and employee turnover since 1980. It also argues that the finding that Fleming was discharged in violation of Section 8(a)(3) is not supported by substantial evidence. We find no merit in any of these arguments and will enforce the Board's order.

## I.

### Unfair Labor Practices

The principal facts, as determined by the ALJ and the Board, are as follows. Between September 15, 1980 and October 10, 1980, Keith Rohman, an organizer for the Union, conducted meetings with Atlas em-

ployees and secured valid authorization cards from 57 of the 93 unit employees. Armed with this card majority, Rohman, together with a group of employees, then confronted production manager Harry Greenberg in his office demanding that the Union be recognized. Greenberg directed them to see either Jack Roman, President of Atlas, or Aaron Wishnoff, the Secretary-Treasurer. When Wishnoff entered, an argument ensued during which Wishnoff told Rohman to leave the premises and go to the Labor Board. In response to Rohman's declaration that there would have to be an election, Wishnoff said, "[S]ure you can go to the government, you can win the election, you bargain one year, two years, three years, *we're not going to agree to anything*." (emphasis added).

Employee Rose Bud Fleming was an early activist in the Union campaign. She attended four Union meetings, solicited signatures for authorization cards and conducted telephone solicitations. Her activity was known to Greenberg through Maria Ayers, a mid-level supervisor whose role in the campaign will be described below. On October 3, Fleming was fired. According to the Company, she was fired for poor work, but the ALJ concluded that she was fired for her activity in the Union organizing campaign. The ALJ pointed out that Greenberg's explanation for the discharge shifted several times during his testimony and that, in some respects, his explanation conflicted with the testimony of Wishnoff. Furthermore, the ALJ found Greenberg alternately "glib" and "hostile", and discredited his testimony.

During the election campaign, Maria Ayers was the supervisor of the Company preparation department, consisting of 22 employees. During the election, she regularly interrogated all the employees in her department, as well as some outside her department, about their Union activity and sentiments. Furthermore, on instructions from Greenberg, she told employees that if the Union won the election, the plant would likely close and the employees would lose their jobs. Ayers also told a number of employees on various occasions that the

Company had spies in the Union and was aware of its every move.

Just before the election, Wishnoff held out the promise of improved benefits and grievance procedures if the Union lost, and threatened harsher work rules if the Union won, and Company President Jack Roman called a meeting at which he threatened that there would be layoffs if the Union won. After the Union lost the November 26 election, the Company instituted two unilateral changes in the conditions of employment. Lunch was extended 15 minutes and a disciplinary warning system was implemented.

Based on these facts, among others, the ALJ found numerous violations of Section 8(a)(1), which makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their statutory rights to organize and to bargain collectively through chosen representatives. 29 U.S.C. § 158(a)(1) (1982). The ALJ found those violations included threats of discharge, plant closure, layoffs and harsher work rules if the Union won and promises of grievance procedures and improved benefits if the Union lost. Further, through interrogation and otherwise, the Company created the impression of surveillance of the organizing activities of its employees. The ALJ found that the discharge of Rose Bud Fleming violated Sections 8(a)(3) and (1), which makes it an unfair labor practice "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3) (1982). Finally, the ALJ found that the Company's refusal to bargain with the Union on and after October 10, 1980 violated Sections 8(a)(5) and (1), which make it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5).

■ The Company contends that many of these conclusions are not supported by "substantial evidence on the record con-

sidered as a whole." 29 U.S.C. § 160(e) (1982). Upon review of the record, we find the Company's contentions to be uniformly without merit. The record shows pervasive unlawful behavior. Substantial evidence supports the Board's findings that Aaron Wishnoff declared the organizing drive to be an exercise in futility; that Maria Ayers, a member of management and a Company agent for whose acts the Company is responsible, threatened that the plant would close if the Union won, and that this threat was never effectively retracted; that Rose Bud Fleming was fired for her Union activity; and that other impermissible threats and promises were communicated to the employees by the Company. These unfair labor practices were the basis for the remedies ordered by the Board.

## II.

### The Bargaining Order

The Company contests the propriety of the bargaining order. In this area, our scope of review is particularly limited.

> In fashioning its remedies under the broad provisions of § 10(c) of the Act (29 U.S.C. § 160(c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts. See *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203 [85 S.Ct. 398, 13 L.Ed.2d 233] (1964).

*NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969).

In *Gissel*, the Supreme Court addressed the two circumstances under which the Board can order an employer to bargain with a union that lost a representation election. If the union has never obtained the support of a majority, the Board may issue a bargaining order only "in 'exceptional' cases of 'outrageous' and 'pervasive' unfair labor practices." 395 U.S. at 613, 89 S.Ct. at 1940 (*Gissel I* bargaining orders). *But see Gourmet Foods, Inc.*, 270 N.L.R.B. No. 113, 116 L.R.R.M. 1105, 1111–14 (BNA) (1984) (no *Gissel I* orders will be issued). However, where the union demonstrates that it once had a majority the Board may issue a bargaining order "in less extraordinary cases marked by less pervasive practices *which nonetheless still have a tendency to undermine majority strength and impede the election process.*" 395 U.S. at 614, 89 S.Ct. at 1940 (emphasis added) (*Gissel II* bargaining orders). Since the Union had obtained a card majority, the bargaining order issued by the Board in this case fell within *Gissel II*.

In three recent in banc decisions we have enforced the Board's imposition of a *Gissel II* bargaining order after applying the criteria established by the Supreme Court. See *NLRB v. Keystone Pretzel Bakery, Inc.*, 696 F.2d 257 (3d Cir.1982) (in banc); *NLRB v. Permanent Label Corp.*, 657 F.2d 512 (3d Cir.1981) (in banc); *Hedstrom v. NLRB*, 629 F.2d 305 (3d Cir.1980) (in banc), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981) (*Hedstrom II*). In each case, we first examined whether the Board "gave adequate reasons for its conclusion that a bargaining order was required." *Keystone Pretzel Bakery*, 696 F.2d at 263. We have justified imposition of this "essentially procedural rule", see *Permanent Label*, 657 F.2d at 522–23 (Aldisert, J., concurring), on the ground that it "assist[s] a reviewing court in determining whether the standards of *Gissel* have been satisfied." *Hedstrom II*, 629 F.2d at 309. We have also held that the Board may rely on the statement of reasons provided by the ALJ for imposing a bargaining order, as it does when it specifically adopts the ALJ's rulings, findings and conclusions. See *Permanent Label*, 657 F.2d at 519.

The ALJ justified his recommendation of a bargaining order in the following way:

> The Company's unfair labor practices were serious and extensive. From mid-September until the election, in late November, supervisor Maria Ayers repeatedly warned employees that their union activities were under surveillance and that the Company would lay them off, close the facility, move it elsewhere, and

terminate them if they selected the Union as their collective-bargaining representative. Ayers warned employees against wearing union buttons and supporting the Union. She advised an employee that the Company had passed over her for a promotion because she believed that she supported the Union. In addition, Ayers coercively interrogated employees regarding their union sentiment and repeatedly solicited employee grievances in an effort to undermine the Union's organizing campaign. Ayers' unfair labor practices had a direct impact on no less than 26 of the 93 employees in the voting unit. It is reasonable to assume that word of her repeated threats reached well beyond that group, and that their coercive effect persists among the employees.

The Company's top management also engaged in a variety of unfair labor practices in October, November, and December which have added to the coercive atmosphere. Thus, on October 10, secretary-treasurer Wishnoff warned a group of employees that the Company would never reach agreement with the Union, thus driving home the idea that their selection of a collective-bargaining representative was futile.

On the very eve of the election, Wishnoff approached an employee and held out promises of improved health benefits and suggested the resolution of employee grievances if the Union were defeated in the next day's election. On the same date, Wishnoff warned employee Parks that if the Union succeeded in the following day's election, the Company would impose harsher work rules which would result in job loss among the voting unit employees. Further, on the same day, Wishnoff seized upon the work of a union supporter and suggested that her job was in jeopardy by criticizing her production record aloud to her fellow employees. Finally, in December, Wishnoff told a group of employees that Respondent was limiting a pending wage increase to 35 cents per hour because of the pendency of the Union's representation petition.

President Jack Roman, on the eve of the election, called a meeting of all employees where he threatened that if the Union succeeded, in the pending representation election, the Company would institute a policy change which would result in layoffs. He also coercively interrogated one employee on the day of the Board-held election.

The impact of the Company's unfair labor practices which began in mid-September and extended to December was strongly reinforced by the termination of a leading and well-known union advocate, Rose Bud Fleming on October 3, at a time when she was openly engaged in the solicitation of authorization cards. The Board has recognized that:

> The discharge of employees because of union activity is one of the most flagrant means by which an employee [sic] can hope to dissuade employees from selecting a bargaining representative, because no event can have more crippling consequences to the exercise of Section 7 rights than the loss of work. *Apple Tree Chevrolet, Inc.*, 237 NLRB 867 (1978).

In sum, I find that the Company's unfair labor practices were sufficient in their pervasiveness and coercive effect to make a fair election impossible on November 26, the day that the Board held a representation election among the Company's employees.

The Company's top management, including Roman, Wishnoff, and Greenberg, who remain demonstrated strong union animus. It was Greenberg who guided Ayers in her persistent and extensive campaign of unfair labor practices leading up to the election of November 26. Greenberg, along with Wishnoff also participated in the unlawful discharge of union activist Fleming. Further, both Roman and Wishnoff engaged in repeated unlawful acts of interference, restraint, and coercion on the eve of the election. Thus, did these three Company officers clearly demonstrate a readiness to suppress the Section 7 rights of their

employees to organize and select a labor organization as their exclusive bargaining representative.

Their continuation in office suggests the likelihood that a second election would be met with a new wave of unfair labor practices designed to interfere with, restrain, and coerce the Company's employees and cause them to turn away from the Union, and abandon any hope of obtaining a collective-bargaining representative. Thus, I find that a bargaining order is warranted in this case to remedy the Company's unfair labor practices. *N.L.R.B. v. Gissel Packing Company*, 395 U.S. at 614, 89 S.Ct. at 1940.

*Compare Permanent Label*, 657 F.2d at 520–21; *Hedstrom II*, 629 F.2d at 310 n. 4.

This comprehensive exposition by the ALJ, which was adopted by the Board, "fully satisfies the requirements of intelligent judicial review." *Keystone Pretzel Bakery*, 696 F.2d at 264. We are not persuaded by Atlas' contention that the ALJ has failed to articulate why a fair rerun election is unlikely. The ALJ's explanation is adequate on its face. He found that a fair second election was unlikely because the officials who were responsible for the serious and pervasive unfair labor practices remain in charge. A more "elaborate explanation of the factors giving rise to the conclusion that a bargaining order is needed is not essential." *Hedstrom II*, 629 F.2d at 309 (quoting *Kenworth Trucks of Philadelphia, Inc. v. NLRB*, 580 F.2d 55, 60 (3d Cir.1978)). Judge Adams, writing for the court in banc, observed, "The requirement of a reasoned analysis setting forth the factors justifying the imposition of a bargaining order, however, was meant neither to burden the Board, nor to 'limit the issuance of bargaining orders whenever necessary.'" *Id.* (quoting *NLRB v. Armcor Industries, Inc.*, 535 F.2d 239, 245 (3d Cir. 1976)).

█ We must be cautious not to use the requirement of articulation that we have imposed as a subterfuge to conceal personal disagreement with the Board's discretionary choice of remedy. Thus, we reiter-ate the remarks of then Chief Judge Seitz, also writing for the court in banc in a very similar case:

We believe that it is sufficient for the ALJ to provide an extensive list of the factors giving rise to his recommendation that a bargaining order be issued, as was done in this case. If we were to require that the ALJ also specifically state each inference drawn from these factors, no matter how obvious it is from the opinion, we would elevate form over substance and overstep the appropriate limits of judicial review of the Board's choice of remedy.

*Permanent Label*, 657 F.2d at 521. The statement of reasons by the ALJ, adopted by the Board, suffices. If we were to require the Board to independently articulate its reasons for imposing a bargaining order, we would be exceeding our "narrow scope of review" of the Board's remedial orders, *see Sure-Tan, Inc. v. NLRB*, ——— U.S. ———, 104 S.Ct. 2803, 2812, 81 L.Ed.2d 732 (1984). In doing so, we would be disregarding the Supreme Court's admonition to allow agencies to fashion their own rules of procedure. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543–44, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978).

█ Thus, it remains for us only to determine whether the Board's entry of the bargaining order satisfies the legal standards for *Gissel II* orders. The record amply justifies the ALJ's denomination of the unfair labor practices committed by the Company as "serious", "extensive", "pervasive" and "coercive". Furthermore, the pattern at issue here conforms to the pattern manifested in those cases where we have enforced *Gissel II* bargaining orders. In *Electrical Products Division of Midland-Ross Corp. v. NLRB*, 617 F.2d 977, 987 (3d Cir.), *cert. denied*, 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980), we referred to three elements as usually found in these cases where we enforced a *Gissel II* order: effect of the unfair labor practices on a significant portion of the bargaining unit, the participation of senior company offi-

cials, and the continuing impact of the same factors that undermined the first election. *See also United Oil Manufacturing Co. v. NLRB*, 672 F.2d 1208, 1212 (3d Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 446, 74 L.Ed.2d 601 (1983).

Ayers' threats of plant closing were communicated directly to at least 26 of the 93 unit employees. The Company can hardly disassociate itself from her activities since it stipulated she was a supervisor and a Company agent. Moreover, Greenberg, who was concededly part of senior management, guided Ayers in what the ALJ called a "persistent and extensive campaign of unfair labor practices." As in *Permanent Label*, "high-level officers, [here the president, secretary-treasurer, and production manager] had threatened reprisals, coercively interrogated employees, and allegedly promised benefits." 657 F.2d at 521.

The Company relies on several opinions of panels of this court that refused to enforce bargaining orders. *See NLRB v. K & K Gourmet Meats, Inc.*, 640 F.2d 460 (3d Cir.1981); *Rapid Manufacturing Co. v. NLRB*, 612 F.2d 144 (3d Cir.1979). Even if the facts in those cases were apposite, and they are not since each involved only minimal unfair labor practices affecting an insignificant number of employees, the labor jurisprudence of this court must be found in our more recent in banc decisions. The unfair labor practices here were at least comparable, and probably even more egregious, than those the in banc court held justified a *Gissel II* bargaining order.

Finally, the unfair labor practices committed by the Company are of a kind that are unlikely to dissipate. The continuing impact of a company's threats of plant closure in the face of unionization, such as here, has often been recognized. *See, e.g., Gissel*, 395 U.S. at 587–90, 618–20, 89 S.Ct. at 1926–27, 1942–43 (bargaining order in one of four cases decided under *Gissel* enforced where only violation was threat of plant closing); *Midland-Ross*, 617 F.2d at 987. Its discharge of a union activist and coercive interrogation of employees must, "in the light of existing knowledge", be viewed as having a continuing impact. *Hedstrom II*, 629 F.2d at 309. The bargaining order will be enforced.

## IV.
### *Fleming Discharge*

We find no merit in the Company's challenge to the finding that employee Rose Bud Fleming was discharged in violation of section 8(a)(3). There is substantial evidence in the record to support the ALJ's finding that Fleming's union activity was a motivating factor in the Company's decision to discharge her and his rejection of the Company's "unconvincing" explanation for that discharge. The Board's order to reinstate Fleming and make her whole will be enforced.

## V.
### *Motion to Remand*

Atlas has filed a motion to have us remand this case to the Board so that additional evidence may be adduced concerning the January 1, 1984 move of the facility to New Jersey and employee turnover since the election. The Board opposes such a remand, stressing that it has consistently refused to consider events, such as employee turnover, that occur subsequent to the commission of unfair labor practices and that no court has held that such employee turnover is, alone, a relevant consideration. In *Hedstrom II* we pointed out that if we were to require the Board to determine whether a continuing majority supports unionization, an employer, particularly one with a rapid turnover rate, would thereby "be able to avoid any bargaining obligation indefinitely." 629 F.2d at 312.

In any event, we find that there were no reasonable grounds for the Company's failure to apprise the Board of its "additional evidence", as required for a remand. *See* 29 U.S.C. § 160(e) (1982). According to the Company, the evidence did not exist until the day of the move, January 1, 1984. Yet since the Company claims that prior to the move it offered its employees the opportunity to transfer, it seems reasonable to

conclude that the Company was aware of its impending move long before December 27, 1983, the date that the Board applied for enforcement.[1] The Company has offered no excuse at all for waiting until May 2, 1984, after all briefs were filed, to make a motion for remand. We will not permit our processes, or the Board's, to be so abused. The motion to remand is denied, and, as we stated above, the Board's order will be enforced.

ADAMS, Circuit Judge, concurring.

Although I am constrained to join the result reached by the majority, I write separately to express my uneasiness with the summary nature of the Board's decision in this case. The question of the adequacy of justifications proffered for *Gissel* bargaining orders has sharply divided this Court, and has caused us to go in banc four times in the last few years. See *NLRB v. Keystone Pretzel Bakery, Inc.*, 696 F.2d 257 (3d Cir.1982) (in banc); *NLRB v. Permanent Label Corp.*, 657 F.2d 512 (3d Cir. 1981) (in banc); *Hedstrom Co. v. NLRB*, 629 F.2d 305 (3d Cir.1980) (in banc), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981); *NLRB v. Armcor Industries, Inc.*, 588 F.2d 821 (3d Cir.1978) (unreported per curiam denying enforcement of bargaining order by an evenly divided vote). That fact alone should suggest to the Board that a *Gissel* order warrants more careful consideration, and a more detailed statement of reasons, than was given here.

The Board's practice of simply adopting ALJ findings, without more, has been considered sufficient by our Court on at least two prior occasions. *See, e.g., Permanent Label*, 657 F.2d at 519; *Kenworth Trucks of Philadelphia, Inc. v. NLRB*, 580 F.2d 55, 61–63 (3d Cir.1978). Nevertheless, I submit that even though it is not legally required to do so, the Board would be well-advised to undertake some independent consideration and to articulate, at least briefly, its reasons when recommending imposition of a bargaining order. This course would be prudent in all cases, but particularly so in close ones, where the factfinder might reasonably have come to a different conclusion regarding the alleged unfair labor practices and where there is no history of union animus.

While the majority's recitation in the present case conveys a picture of egregious employer misconduct, I believe that the facts are subject to varying colorations, not all of which are as unambiguously dark as the majority opinion would suggest. Given the nature of this case, it would have been preferable for the Board to have done more than simply adopt the findings and conclusions of the ALJ. A practice by which an administrative agency expressly justifies its decisions comports with a long tradition in our legal culture, that of providing reasons for countermajoritarian results. The *Gissel* bargaining order, like judicial review itself, is potentially anti-democratic: the order arises from an adversarial union-employer proceeding in which the employees have no voice, and imposes a union on a majority of employees who may oppose it. *Gissel* orders, however, are considered necessary, just as is judicial review, because we live in a community in which the democratic process is not and probably cannot be free from the distorting influences of disparate economic power. In such a situation, measures which facially appear to run counter to majority votes, where properly circumscribed, may serve to protect the democratic process itself.

But if an anti-democratic solution is to be adopted, proper circumscription is critical. In a society founded upon democratic principles, it is incumbent upon those institutions that exercise potentially countermajoritarian power to provide explanations for their actions. The requirement of reasoned

---

1. The Board notes that the Union has filed charges that the Company violated Sections 8(a)(5) and (1) by failing to bargain over the effects of the move. In its preliminary investigation of the charges. Case No. 4–CA–14405, the Board has found evidence suggesting that the Company knew it was moving even before August 26, 1983 when the Board issued its bargaining order.

decisionmaking encourages careful consideration by the institution itself, and is also essential to further the ends of consistency, predictability, and rationality. *Hedstrom*, 629 F.2d at 309.

A bargaining order constitutes at once a direct threat to, and an appropriate safeguard for, the democratic nature of union elections. Because it walks the line between undermining and guaranteeing true representation, I believe that a bargaining order requires exceedingly careful consideration. While the Board may have given this matter such consideration, we cannot determine whether in fact it did so since it merely adopted the ALJ's findings. Therefore, while I concur because the Board did all that was required under the state of the law in this Circuit, I write to urge the Board and Congress to reconsider this policy.