**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**OMNITEST INSPECTION SERVICES, INC., Amspec Technical Services, a Partnership, and Amspec Technical Services, Inc., Respondents.**

No. 90–3420.

United States Court of Appeals, Third Circuit.

Argued Jan. 22, 1991.

Decided June 28, 1991.

Collis Suzanne Stocking, Supervisory Atty., Nancy J. Gottfried (argued), Jerry M. Hunter, Robert E. Allen, and Aileen A. Armstrong, N.L.R.B., Washington, D.C., for petitioner.

Fred R. Kimmel (argued), Fred R. Kimmel & Associates, Chicago, Ill., for respondents.

Before BECKER and HUTCHINSON, Circuit Judges, and SMITH, District Judge [*].

## OPINION OF THE COURT

BECKER, Circuit Judge.

This case is before us on the application of the National Labor Relations Board for enforcement of its order issued against Omnitest Inspection Services, Inc. ("OTIS") and Amspec Technical Services, Inc. ("Amspec"). 29 U.S.C. § 160(e). The Board's order depends on its conclusion that Amspec is the "alter ego" of OTIS. Amspec takes issue with that conclusion. In addition, Amspec disputes the Board's decision that by reason of its alter ego status it violated the National Labor Relations Act ("Act"), 29 U.S.C. §§ 158(a)(1), (2), (3), and (5), in the following respects: (1) by discharging OTIS employee Patrick Barrett for joining Local 2B of the International Union of Operating Engineers, AFL–CIO ("Local 2B"); (2) by pretending to go out of business and withdrawing recognition of Local 2B; (3) by failing to pay contributions to Local 2B's health, welfare, and pension funds and thus repudiating its collective bargaining agreement with the union; and (4) by recognizing the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO ("UA") as the representative of its employees.

When an employer attempts to avoid its labor obligations by pretending to cease operations and then resuming the same operations through another employer, the other employer is held to be the "alter ego" of the old employer, and is "subject to all the legal and contractual obligations of the predecessor." *Howard Johnson Co. v. Detroit Local Joint Exec. Board,* 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 2242 n. 5, 41 L.Ed.2d 46 (1974). Our alter ego jurisprudence provides that a number of factors should be considered in determining alter ego status, and that no one factor is dispositive. *NLRB v. Al Bryant, Inc.,* 711 F.2d 543, 553 (3d Cir.1983), *cert. denied,* 464 U.S. 1039, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984); *Fugazy Continental Corp.,* 265 NLRB 1301, 1301–02 (1982), *enforced,* 725 F.2d 1416 (D.C.Cir.1984); *Woodline Motor Freight, Inc.,* 278 NLRB 1141, 1231 (1986), *enforced in relevant part,* 843 F.2d 285, 288–89 (8th Cir.1988). This application for enforcement presents, *inter alia,* the interesting question whether the absence of substantial similarity in ownership between two employers precludes the imposition of alter ego status, even though the employers have substantially the same management, business purpose, operations, equipment, and customers. We conclude that it does not, and for the reasons that follow, we will enforce the Board's order.

## I. FACTUAL BACKGROUND

### A. *The Formation of OTIS*

The principal figure in this case is Dan McCool, the president of Amspec and former president of OTIS. McCool has worked in the non-destructive testing industry for more than eleven years, primarily in Canada and Alaska. Non-destructive testing consists of using x-ray cameras, ultrasonic equipment, and dye penetrants, among other means, to determine the structural soundness of oil storage tanks, pipelines, steel bridge supports, etc., without damaging the structures. During 1984 and 1985, McCool approached Local 2B, a major factor in the pipeline testing industry, to ascertain the types of labor contracts available and to explore the outlook for non-destructive testing work in the New Jersey area. McCool also began negotiating with Jurgen Dreher, a German national, to establish a United States non-destructive testing company specializing in pipeline testing. The negotiations resulted in the creation of OTIS on April 3, 1985. The minutes of OTIS's first shareholders' meeting reflect that B.I.X. Holdings, Ltd. ("B.I.X.") and Edward T. Robertson, Inc., two

[*] The Honorable D. Brooks Smith, United States District Judge for the Western District of Pennsylvania, sitting by designation.

groups affiliated with Dreher, owned 60% of OTIS's shares,[1] that McCool owned 20%, and that two other individuals owned 10% each.[2]

McCool owned, and leased to OTIS, the trucks, darkrooms, cameras, and safety equipment that OTIS needed to perform non-destructive testing. McCool also negotiated and executed a collective-bargaining agreement for OTIS with Local 2B. This agreement guaranteed a 40–hour week for all of OTIS's employees engaged in both pipeline and non-pipeline testing. The agreement further obligated OTIS to withhold specific sums from its employees' paychecks for union dues and for the union's health, welfare, and pension funds. The agreement also contained a union security clause, requiring every OTIS technician to either be or become a Local 2B member, and a union referral clause, requiring OTIS to hire its technicians and assistant technicians from a union referral hall list.

### B. *OTIS's Operations and Management*

Because McCool lived in the Chicago area, OTIS hired Paul Owen as its day-to-day manager. Owen trained, tested, and certified the employees as non-destructive testing technicians. McCool, who maintained daily contact with Owen, reported OTIS's cash flow position to B.I.X. every two weeks. In time, B.I.X. set up a $100,-000 line of credit for OTIS at the Standard Charter Bank in Chicago. McCool and Dreher were the signatories on this account. McCool withdrew funds from this account, which were used for OTIS's payroll, and deposited them into another account at the Bank of Berwyn, on which McCool was the sole signatory.

McCool testified that he needed B.I.X.'s approval for any equipment purchase over $5,000 and to make bids on major projects. Because most of OTIS's jobs involved non-pipeline testing which did not come from bids, McCool infrequently required B.I.X.'s approval. Instead, he obtained jobs for OTIS by spending one week out of every month at OTIS contacting potential clients and informing them of OTIS's prices. Owen would then make follow-up visits.

### C. *The Discharge of Patrick Barrett*

Owen initially was given the authority to hire and fire employees, but McCool recaptured this authority when he initiated a hiring freeze in January of 1986. McCool thereafter told Owen to fire all employees who would not take work on a job-to-job basis, even though the collective bargaining agreement with Local 2B guaranteed a 40–hour work week. Patrick Barrett was then discharged.

Owen had contacted Barrett in January of 1986 and had hired him as a permanent employee. Barrett worked for two to three weeks, during which time he was paid as a Level I technician. Barrett's pay stubs, however, failed to reflect that any taxes were being withheld. When Barrett inquired about the blank pay stubs, Owen responded that Barrett had been retained as a subcontractor and not as an employee of OTIS. Barrett then reminded Owen that he had been hired as a permanent employee. Barrett also informed Owen that, thinking himself to be an employee of OTIS, he had joined Local 2B and paid the initiation fee. Owen became visibly upset, and told Barrett that he should not have joined the union because he was a subcontractor. When Barrett next arrived for work, Owen, believing that he had discharged Barrett, angrily asked him why he was there. Barrett disputed that Owen had discharged him, but Owen reiterated that he was fired. Although OTIS hired several people after discharging Barrett,

---

1. Dreher was the managing director of B.I.X. and an officer of Edward T. Robertson.

2. The Board's decision assumed that B.I.X. and Edward T. Robertson owned 60% of OTIS's shares outright. Although some correspondences between B.I.X. and McCool arguably suggest that the financial contribution made by these concerns more closely resembled long-term debt than equity, the Board neither addressed that particular issue nor decided the actual percentage of McCool's formal ownership interest. Instead, it concluded that McCool exercised de facto control over OTIS.

and OTIS advertised for a Level I technician, OTIS never rehired Barrett.

### D. *OTIS's Demise*

OTIS began experiencing financial problems in February of 1986. Soon thereafter, Dreher and the financial manager of B.I.X. visited OTIS and reviewed the financial situation. As a result of these visits, B.I.X. decided to discontinue its United States operations through OTIS and offered to pay $50,000 of the taxes that OTIS owed the Internal Revenue Service ("IRS") if McCool would liquidate OTIS immediately. On April 29, 1986, B.I.X. cut off all funds to OTIS and sent McCool a telex directing him to cease OTIS's operations at once.

McCool chose not to liquidate OTIS, and instead operated OTIS on the strength of its accounts receivable. OTIS was able to meet its payroll and to make payments on the equipment that it had leased from McCool. However, when Owen quit at the end of May, McCool, who could not run the company from Chicago, decided to liquidate OTIS. He nonetheless continued to operate OTIS through June, in order "to make a good portion on the IRS payables, complete the payroll out and there might be a few dollars left ... to settle with [Local 2B]."

OTIS retained four employees during May, and also advertised for a Level I technician in a local newspaper. David Geisendorfer and Gary Whisenhunt subsequently were hired and continued as technicians for OTIS through June, with John Coulson serving as the supervisor. Only Whisenhunt was hired through the Local 2B referral hall. Sometime during May, McCool met with a business agent for the UA to learn about the type of labor contracts available for "nuclear and inside defense work" in the non-destructive testing

industry. McCool testified that OTIS closed its doors on June 30, 1986.

### E. *The Formation of Amspec*

McCool and Coulson formed a partnership, Amspec Technical Services,[3] which commenced business on July 1, 1986, the day after OTIS closed.[4] McCool and Coulson owned 80% and 20% of Amspec's shares, respectively. Starting July 1st, both Amspec and OTIS were based physically in a trailer located on the property where OTIS had leased an office. Both companies shared the same telephone number and address, and the trucks and equipment that McCool had leased to OTIS he now leased to Amspec.

When it opened on July 1st, Amspec employed Coulson, Geisendorfer, and Whisenhunt, the same three technicians that had worked for OTIS on June 30th. During the month of July, Amspec provided non-pipeline testing services for two companies that had been clients of OTIS. OTIS's certificate of incorporation expired on September 2, 1986. In September, Amspec moved to another location in Woodbridge, New Jersey. McCool now handles the accounts receivable and payable for Amspec, and establishes client contacts in the nuclear field. Coulson works as Amspec's day-to-day manager, contacts potential clients, supervises ongoing jobs, and works as a technician. In addition, Coulson hires, trains, certifies, and fires Amspec's employees.

### F. *McCool's Representations to Local 2B*

On May 29, 1986, a full month *before* OTIS ceased doing business, McCool met with Walter Russell, a Local 2B business representative, to discuss grievances filed by Barrett and another employee. McCool informed Russell that, in his view, some of

---

3. McCool and Coulson intended the partnership to be a corporation, but their attorney initially failed to file the incorporation papers. Amspec finally was incorporated on January 2, 1987.

4. Coulson and McCool both testified that Coulson approached McCool around the middle of June to see if he could lease a truck from McCool in order to continue doing non-destructive testing for two of OTIS's clients. Coulson

testified that, although McCool rejected his initial request, he again approached McCool to form another non-destructive testing company that would focus on non-pipeline testing. The Administrative Law Judge ("ALJ") discredited this testimony, finding that it was McCool, and not Coulson, who had an entrepreneurial personality.

the grievances lacked merit, and that, if Local 2B continued to push them, he would close OTIS and open another company. McCool also promised to rehire Barrett at the first opportunity. Russell then reminded McCool that OTIS's payments for the employees' benefits and union dues were in arrears. Because Russell had heard that McCool was hiring new people, he also explained to McCool that the collective bargaining agreement obligated OTIS to hire through the union's referral hall.

McCool did not inform Russell at this meeting that OTIS was going out of business or experiencing financial problems. However, when Russell later called Owen to ask why Barrett had not been rehired, Owen stated that McCool was starting a new company called Amspec. Owen also told Russell that he was leaving OTIS. When Russell visited OTIS in mid-June, he learned that Coulson had replaced Owen as the supervisor.

Russell did not meet McCool again until July 23, 1986. McCool requested the July 23rd meeting in response to union complaints about OTIS's failure to make payments to the employees' health, welfare, and pension funds, and for union dues. The parties also discussed arbitration of Barrett's grievances. Instead of telling Local 2B that OTIS had ceased operations, and that he had started Amspec, McCool told the union that the European financial backers had pulled out of OTIS, and that OTIS might go out of business because it was in dire financial straits. McCool also told Local 2B that he had been talking with the UA about its wage rates. McCool threatened to form a new company and sign a collective bargaining agreement with the UA if Local 2B would not settle its claim for the employees' unpaid benefits. Local 2B offered to settle its $22,000 claim against OTIS for $10,000. McCool told Local 2B that he would have to see how much money OTIS had left. In August, 1986, McCool offered the union $4,000 to settle the $22,000 claim for unpaid union benefits and dues. The offer was rejected.

### G. *Amspec's Recognition of the UA*

As mentioned above, McCool first met with the UA in May of 1986, before OTIS had ceased operations. McCool continued to meet with the UA throughout the next few months, and executed a collective bargaining agreement with the UA in the fall of 1986. The UA collective bargaining agreement required Amspec employees to become members of the UA, but it did not obligate Amspec to pay fringe benefits to a union fund. Amspec began paying its employees the UA wage rate in January, 1987.

## II. THE ALTER EGO RELATIONSHIP

### A. *The Board's Decision*

A three-member panel of the Board considered Amspec's exceptions to the ALJ's decision that Amspec is the "alter ego" of OTIS. The Board examined whether there were any changes in business management, purpose, premises, equipment, customers, market, ownership, or control from OTIS to Amspec. The Board found that McCool had shut down OTIS on Monday, June 30, 1986, and had opened Amspec on the next day, Tuesday, July 1, 1986, at the same business address with the same telephone number, stationery, and business slogan. The Board also found that Amspec performed non-pipeline testing work for OTIS's customers, with OTIS's employees, and with the same equipment leased from McCool.

The Board agreed with the ALJ that McCool's minority ownership of OTIS did not preclude a finding of alter ego status, because McCool effectively had controlled OTIS's operations before B.I.X. requested McCool to close OTIS. The Board also concluded that, in any event, McCool had exercised unfettered control over OTIS after B.I.X. had pulled out, and that such control was a surrogate for actual ownership. Finally, the Board found ample evidence supporting the ALJ's finding that McCool had formed Amspec to avoid OTIS's agreement with Local 2B, which specified a 40–hour work week, higher wage rates, and required contributions to the employees' benefit funds, and the Board endorsed that finding.

B. *The Jurisprudence*

 Because an employer cannot avoid its labor obligations by pretending to cease operations one day and then resuming operations the next day through a "new" employer, the "new" employer, as the "alter ego" of the "old" employer, is "subject to all the legal and contractual obligations of the predecessor." *Howard Johnson Co.*, 417 U.S. at 259 n. 5, 94 S.Ct. at 2242 n. 5; *see also District 1199P, National Union of Hospital & Health Care Employees v. NLRB*, 864 F.2d 1096, 1099 n. 2 (3d Cir.1989); *NLRB v. Scott Printing Corp.*, 612 F.2d 783, 785 (3d Cir.1979). An alter ego relationship is established when there is a "mere technical change in the structure or identity of the [old] employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management." *Howard Johnson Co.*, 417 U.S. at 259 n. 5, 94 S.Ct. at 2242 n. 5. The determination of alter ego status depends on whether there has been "a bona fide discontinuance and a true change [in] ownership" of the old employer, or "a disguised continuance of the old employer." *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106, 62 S.Ct. 452, 456, 86 L.Ed. 718 (1942). For an alter ego relationship to exist, a purpose to avoid the old employer's labor obligations under a collective bargaining agreement or under the Act must underlie the formation of the new employer. *Fugazy Continental Corp.*, 265 NLRB at 1302.

 To determine whether there has been a "true change in ownership" or a "disguised continuance" of the old employer, the Board looks to whether the old and new employers share " 'substantially identical' management, business purpose, operation, equipment, customers and supervision, as well as ownership." *Amalgamated Meat Cutters & Butcher Workmen v. NLRB*, 663 F.2d 223, 226–27 (D.C.Cir.1980); *Crawford Door Sales, Co.*, 226 NLRB 1144 (1976). None of these factors, however, "taken alone, is the sine qua non of alter ego status." *Fugazy Continental Corp.*, 265 NLRB at 1301–02; *Woodline Motor Freight*, 278 NLRB at 1231, *enforced in*

*relevant part*, 843 F.2d at 288–89. Instead, the sum total of the factors, viewed together, help determine whether the two employers are " 'the same business in the same market.' " *Fugazy Continental Corp.*, 265 NLRB at 1301–02 (quoting *International Harvester Co. & Muller International Trucks, Inc.*, 247 NLRB 791, 798 (1980)).

C. *Whether De Facto Control Can Substitute for Ownership in Determining Alter Ego Status?*

 Amspec disputes the Board's legal conclusion that McCool's de facto control of OTIS can substitute for the ownership factor in determining whether Amspec is the alter ego of OTIS. Amspec argues that, because McCool held a minority ownership interest in OTIS, he could not have controlled OTIS, and that the only owners who could have benefitted from avoiding OTIS's labor obligations, the majority owners, do not have an ownership interest in or control over Amspec. Amspec's challenge to the Board's reliance on actual control suggests that an alter ego finding should turn upon formal ownership alone. This argument ignores the Board's decisions that the substantial identity of formal ownership between two employers is not the *sine qua non* of an alter ego relationship. *See Fugazy Continental Corp.*, 265 NLRB at 1301–02; *Woodline Motor Freight*, 278 NLRB at 1231. The Board's legal conclusions are entitled to deference as long as they result from a reasonable and defensible construction of the Act. *NLRB v. Local 103, Int'l Assoc. of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978); *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266–67, 95 S.Ct. 959, 968–69, 43 L.Ed.2d 171 (1975). We are satisfied that the Board's multi-factor test is a reasonable construction of the Act, and that depending on the facts of the case, actual control can be more significant than formal ownership.

A case on point is *Hydro Logistics, Inc.*, 287 NLRB 602 (1987), *enforced sub nom. NLRB v. Wizard Method, Inc.*, 897 F.2d 1233 (2d Cir.1990). There, the sole stock-

holder of Wizard Method, Inc., a corporation providing industrial cleaning services based in Niagara Falls, financed the operations of a second industrial cleaning company, Hydro Logistics, Inc., in Buffalo. Although the owner of Wizard started Hydro in order to avoid travel pay for those employees who commuted from Niagara Falls to Buffalo, he did not own any of its stock. Some of Wizard's employees worked for Hydro, however, and Hydro used Wizard's trucks and equipment. Wizard's owner also dictated which Wizard employees Hydro could employ and discussed with Hydro's president how three Hydro employees should be disciplined. 287 NLRB at 605–06. The Board found that Hydro

> was essentially a corporate shell having substantially identical management, business purpose, operation, equipment, customers, and supervision with Wizard and was used by Wizard for the purpose of evading responsibilities under the Act.... While the two corporations did not have the same ownership, ... Wizard's president 'controlled Hydro's operations overall and even its daily business'....

*Id.* at 602 (citations omitted).

Also instructive is *Woodline Motor Freight,* where the Eighth Circuit found an alter ego relationship between Woodline and ABE. Woodline had closed its Springdale terminal after learning that the majority of the terminal's employees favored the union. Woodline then arranged financing for ABE to purchase Woodline's trucks, rent the Springdale terminal, and operate a non-union trucking business for Woodline under Woodline's name, freight license, and supervision. 843 F.2d at 288. Although the Eighth Circuit never decided who owned ABE, it commented that ABE "held [itself] out to the public as if ownership in the Springdale operation had never changed." *Id.* at 289. The court clearly determined that Woodline's control over ABE's operations overshadowed any difference in the ownership of the two businesses.

In *J.M. Tanaka Construction, Inc. v. NLRB,* 675 F.2d 1029 (9th Cir.1982), both employers were controlled by Raymond Tanaka. Tanaka owned 8% of J.M. Tanaka, the "old" employer, and 100% of R.M. Tanaka, the "new" employer. He formed R.M. Tanaka when J.M. Tanaka fell behind in its fringe benefit payments to the union. After J.M. Tanaka closed, R.M. Tanaka bought most of J.M. Tanaka's equipment and leased one of J.M. Tanaka's premises. All of J.M. Tanaka's former employees eventually went to work for R.M. Tanaka, and R.M. Tanaka began performing essentially the same type of construction projects as J.M. Tanaka had. Although R.M. Tanaka paid its employees union wages, it did not provide the fringe benefits contained in J.M. Tanaka's collective bargaining agreement. *Id.* at 1032–33. The Ninth Circuit held on appeal that common ownership was "not a necessary prerequisite to an alter ego finding." *Id.* at 1035. Indeed, it stated that common ownership was "but one [factor], and not always an important factor[,] to be considered in determining the existence of an alter ego relationship." *Id.* In response to the arguments that J.M. Tanaka and R.M. Tanaka had different headquarters and officers, the court emphasized that "it is actual and not merely potential control that is determinative." *Id.* at 1034. The court further noted that the owners of J.M. Tanaka were members of the Tanaka family, and that Raymond Tanaka "clearly dominated both corporations." *Id.* at 1035.

Furthermore, this court has stated that the old employer's motivation in forming the new employer and the degree of control the old employer exercises over the new employer's business are critical variables in the alter ego determination. *See Al Bryant,* 711 F.2d at 553–54; *Scott Printing Corp.,* 612 F.2d at 786. In *Scott Printing Corp.,* for example, the employer, Scott Printing, informed the union that it would have to sell or shut down its composing room because it could not compete with non-union composition. Several composing room employees thereafter offered to buy the composing room, and Scott Printing prepared a sales agreement with terms favorable to the employees. After the sale, the employees performed the same duties,

utilized the same equipment, and even used Scott Printing's supplies, typist, messenger service, and accountant without charge. Although the sales agreement allowed the employees to refuse work from Scott Printing and to service other customers, the employees never availed themselves of these options. The sales agreement also provided for a commercial lease, which was never executed, nor were rent payments ever made. The union that had represented the employees before the sale approached them to negotiate a collective bargaining agreement, but the employees refused. 612 F.2d at 785–86.

When the dispute reached this court, we held that the above facts indicated that Scott Printing controlled the operations and workload of the composing room even after it was sold. In doing so, we determined that "[a] nominal change in ownership is not dispositive ... and the Board must, of necessity, examine the actual operation of the new business in making its decision." *Id.* at 786 (citation omitted). We also held that the "crucial element in a decision to apply the alter ego doctrine ... is a finding that the older company continued to maintain a substantial degree of control over the business claimed to have been sold to the new entity." *Id.*

In sum, the foregoing cases look beyond who formally owns the "old" and "new" employers, and focus as well upon who exercises actual control. We conclude here that it is actual control that highlights whether the change in formal ownership between the old and new employers is the type of "mere technical change in the structure or identity" of an employer that is proscribed by the alter ego doctrine.[5]

### D. *Does Substantial Evidence Support the Board's Factual Findings?*

█ The Board found that, because McCool controlled the formation, operations, and labor relations of both OTIS and Amspec, and because both companies had substantially the same management, business purpose, supervisor, employees, location, equipment, and customers, Amspec was the alter ego of OTIS. Amspec now contests this finding.

Amspec argues that McCool did not exercise actual control over OTIS, and that he served at the pleasure of its majority owners. Amspec claims that B.I.X. controlled OTIS's payroll account and any bids or large expenditures. Amspec also asserts that McCool did not "inherit" a controlling ownership interest in OTIS by deciding to continue OTIS after B.I.X. had pulled out. Rather, Amspec contends that this decision was a reasonable interpretation of B.I.X.'s request to cease operations immediately, allowing McCool to protect himself from personal liability and to wind up OTIS's affairs in an orderly manner. Further, Amspec suggests that McCool's threats to shut down OTIS and form another company were made by him as OTIS's agent trying to negotiate a settlement with Local 2B. Amspec also submits that McCool's ownership of OTIS's business assets, i.e., the trucks and testing equipment, did not give him control of OTIS.

In addition, Amspec contends that, because the Board's alter ego determination turns upon events which occurred during Amspec's formation, the Board failed to consider that Amspec, unlike OTIS, performs high-tech, non-destructive testing. Amspec submits that, because the number of customers in the non-destructive testing

---

**5.** We do not suggest that there are not instances where a person with a minority ownership interest in a business will legitimately buy the business, or form a new company to do the same type of business. *See, e.g., Amalgamated Meat Cutters,* 663 F.2d at 227 (small ownership link was insufficient to establish alter ego relationship where minority shareholder and manager of grocery store relinquished ownership interest in store, and then later purchased store, along with others, in arm's-length transaction after store closed for one month); *NLRB v. Bell Co.,* 561 F.2d 1264, 1268 (7th Cir.1977) (no alter ego relationship found where former president of Bell formed new company with similar product, at same location, with same equipment, same suppliers, when no commonality of ownership existed between Bell and new company, and former president had served at pleasure of Bell's owners). These decisions applied the multi-factor test and determined that the new employer was formed as the result of an arm's-length transaction.

industry is limited, the Board should not have accorded weight to the fact that Amspec and OTIS shared the same customers. Amspec concludes that the only links between OTIS and Amspec are McCool's minority ownership of OTIS and his majority ownership of Amspec and his long-distance management of both companies. These links, Amspec argues, are insufficient to confer alter ego status.

Amspec's arguments call upon us to weigh the evidence differently than did the Board. The determination that an alter ego relationship exists is a question of fact for the Board, which we must uphold if, upon review of the entire record, it is supported by substantial evidence. *Scott Printing Corp.*, 612 F.2d at 787. Under the substantial evidence standard, a reviewing court may not displace the Board's factual inferences even if the court would have reached a different conclusion on *de novo* review. *NLRB v. United Insurance Co. of America*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

Despite Amspec's contention to the contrary, the Board did not find that McCool "inherited" a controlling interest in OTIS after B.I.X. pulled out. The Board instead found that McCool had effectively controlled OTIS's formation, operations, and labor relations since its inception, and that his control was absolute once B.I.X. left. The testimony showed that McCool negotiated the formation of OTIS with Dreher, and that he negotiated the collective bargaining agreement with Local 2B. McCool decided that OTIS should only hire those technicians who would take work on a job-to-job basis, and he administered the budget and approved the expenses for OTIS. The Board's comment that McCool's relationship to B.I.X. "resembled that of a borrower to a bank" is supported by McCool's testimony that B.I.X. provided money for OTIS after McCool telexed OTIS's expenditures to B.I.X. every two weeks. There was no testimony that B.I.X. ever refused to meet OTIS's expenses prior to its request that McCool close OTIS for business.

The record further reflects that McCool continued OTIS's operations after B.I.X. pulled out in order to limit his liability for income taxes, as an owner of OTIS, and to limit his liability for payments on the trucks, as the owner of the trucks. McCool was more than an employee of OTIS. McCool was a minority owner of OTIS who continued to act as an owner and not as an agent when he decided to continue operations and to negotiate a settlement with Local 2B. Regardless of whether the majority owners benefitted from McCool's continued operation of OTIS and subsequent formation of Amspec, McCool benefitted too by limiting his liabilities and maintaining his foothold in the industry.

In addition to control, there was substantial evidence supporting the Board's conclusion that the two companies had substantially the same management, business purpose, supervisor, employees, location, equipment, and customers. McCool developed and enlarged the client base for both companies, while Owen and then Coulson managed the companies on a daily basis. The majority of non-destructive testing performed by both OTIS and Amspec involved non-pipeline testing rather than pipeline testing. Amspec now performs high-tech, non-destructive pipeline testing in addition to non-pipeline testing, but that difference does not preclude a finding of alter ego status. OTIS and Amspec shared the same location and telephone number for about three months. Their employees and clients were essentially the same. McCool's equipment was necessary for, and was used by, both companies. Although Amspec correctly notes that McCool's ownership of the trucks and equipment does not, by itself, establish his control of OTIS, it supports the Board's conclusion that Amspec and OTIS have substantially similar equipment. In addition, that Amspec provided similar services for the same customers as OTIS helps establish that Amspec is the same employer in the same market as OTIS. The limited number of customers in the non-destructive testing industry only demonstrates how small that market is.

Finally, the Board's finding that McCool exhibited anti-union animus is supported by

substantial evidence. From the start, McCool breached the collective bargaining agreement with Local 2B by failing to: (1) set aside money to pay the employees' benefits; (2) guarantee a 40–hour work week; and (3) hire OTIS's technicians through the union referral hall. Most importantly, McCool told Local 2B in May of 1986 that he would close OTIS and open another company if the union continued to press certain employee grievances or failed to settle its claim for the employees' health, welfare, and pension benefits. These actions clearly support a finding of an anti-union animus.

In short, even though Amspec and OTIS do not share substantially the same ownership, the Board's conclusion that Amspec is the alter ego of OTIS is supported by substantial evidence. As we have explained, no one factor, "taken alone, is the sine qua non of alter ego status." *Fugazy Continental Corp.*, 265 NLRB at 1301–02. Here, OTIS and Amspec shared substantially the same management, business purpose, operation, equipment, customers, supervision, and control. It therefore follows that the Board's finding that Amspec is the kind of "disguised continuance" of an old employer that the alter ego doctrine was designed to address is supported by substantial evidence.

Once an employer is found to be the alter ego of another, it is responsible for the other employer's violations of the Act, as well as its obligations under the collective bargaining agreement. *Scott Printing Corp.*, 612 F.2d at 785. The Board's finding that OTIS and Amspec violated Section 8(a)(1) and (5) of the Act by repudiating the collective bargaining agreement with Local 2B is supported by OTIS's failure to make contributions to the employees' health, welfare, and pension funds; by OTIS's failure to honor the minimum 40–hour work week guaranteed in the agreement; and by OTIS's failure to hire employees from the union's referral hall. The record also supports the Board's finding that OTIS and Amspec violated Sections 8(a)(1), (2), and (3) of the Act when they withdrew recognition from Local 2B as the exclusive bargaining representative of their employees and instead recognized the UA as the exclusive representative.

### III. THE DISCHARGE OF PATRICK BARRETT

The Act prohibits an employer from discharging an employee because of union membership or activities. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 397–98, 103 S.Ct. 2469, 2472, 76 L.Ed.2d 667 (1983); *Wright Line, a Div. of Wright Line, Inc.*, 251 NLRB 1083, 1089 (1980), *enforced on other grounds*, 662 F.2d 899, 901 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982); *NLRB v. Atlas Microfilming, Div. of Sertafilm, Inc.*, 753 F.2d 313, 316, 319 (3d Cir.1985). The employer's motivation in firing the employee is essential to finding a violation, and the Board may look to both direct and circumstantial evidence to determine whether an unlawful motive exists. *See Scott Printing Corp.*, 612 F.2d at 787. Relevant factors include whether the employer knew about the employee's union activity; whether the employer was hostile towards the union; the timing of the employee's discharge; and the employer's reasons (or lack thereof) for discharging the employee. *See, e.g., NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160, 169–70 (3d Cir.1977); *NLRB v. Princeton Inn Co.*, 424 F.2d 264, 266 (3d Cir. 1970). When an employee is discharged for joining a union, the employer has violated the Act unless it can demonstrate that the employee would have been discharged regardless of his or her union membership. *Transportation Management Corp.*, 462 U.S. at 401–03, 103 S.Ct. at 2474–75.

The Board adopted the ALJ's conclusion that Barrett was discharged from OTIS for joining Local 2B. The Board found that OTIS's failure to withhold taxes from Barrett's paycheck, its attempt to classify Barrett as a subcontractor rather than a permanent employee, and its failure to make payments to the employees' pension, health, and welfare funds constituted evidence of anti-union bias. The Board concluded that these factors suggested that OTIS had treated Barrett as a subcon-

tractor in order to avoid its obligations under the collective bargaining agreement with Local 2B. Because neither OTIS nor Amspec demonstrated that Barrett would have been fired absent his union activities, the Board concluded that Barrett was discharged for joining Local 2B, in violation of Section 8(a)(3) and (1) of the Act.

Amspec now disputes that OTIS had any hostility towards the union when it fired Barrett. We find, however, that the Board's decision that OTIS fired Barrett for joining Local 2B is supported by substantial evidence. McCool authorized Barrett's employment on a permanent basis as a Level I technician in January, 1986. Owen then discharged Barrett after he disputed his classification as a subcontractor and stated that he had joined Local 2B. At that time, OTIS had not been paying its employees' benefits, and McCool, in contravention of the collective bargaining agreement, had directed Owen to hire only those technicians who would work on a job-to-job basis. Because OTIS was avoiding its obligations under its agreement with Local 2B when Barrett was discharged, the Board's conclusion that OTIS's attempted treatment of Barrett as a sub-contractor and OTIS's ultimate discharge of Barrett were motivated by anti-union animus is supported by substantial evidence.

Amspec also asserts that OTIS could fire Barrett because he was a casual laborer and not a Level I technician. This contention flies in the face of testimony that Barrett was a trainee with OTIS for a Level I technician position. Barrett was discharged before he had finished the three-month training period. Amspec can not now claim that Barrett was not covered by the collective bargaining agreement, or that Barrett was not qualified for the position, simply because OTIS had not finished training and certifying him. OTIS hired Barrett to replace a Level I technician, and OTIS paid Barrett the contract rate for a Level I technician. In sum, the Board's decision that OTIS violated Section 8(a)(1) and (3) of the Act by discharging Barrett because he joined Local 2B is supported by substantial evidence.

## IV. CONCLUSION

For all the foregoing reasons, the order of the Board will be enforced.