

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-6-1994

# Stardyne, Inc. v. NLRB

Precedential or Non-Precedential:

Docket 94-3054

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Stardyne, Inc. v. NLRB" (1994). *1994 Decisions.* Paper 210.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/210

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

——————————

No. 94-3054

——————————

STARDYNE, INC.,
Petitioner

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent

United Steelworkers of America, AFL-CIO-CLC,
Intervenor-Respondent

——————————

No. 94-3056

——————————

JOHNSTOWN CORPORATION,
Petitioner

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent

The United Steelworkers of America, AFL-CIO-CLC,
Intervenor-Respondent

——————————

No. 94-3096

——————————

NATIONAL LABOR RELATIONS BOARD,
Petitioner

v.

JOHNSTOWN CORPORATION, and its
alter ego, STARDYNE, INC.,
Respondent

United Steelworkers of America, AFL-CIO-CLC,
Intervenor-Respondent

ON PETITION FOR REVIEW AND CROSS-APPLICATION
FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

(No. 6-CA-22363)

_____

Argued: September 12, 1994
Before: STAPLETON, ALITO, and LEWIS, Circuit Judges

(Opinion Filed: December 6, 1994)

_____

MARK E. SCOTT, ESQ. (Argued)
P. O. Box 95
Bridgeville, PA 15017

Attorney for Stardyne, Inc.

CLARE M. GALLAGHER, ESQ. (Argued)
DOEPKEN KEEVICAN WEISS & MEDVED
PROFESSIONAL CORPORATION
37th Floor, USX Tower
600 Grant Street
Pittsburgh, PA  15219

Attorneys for Johnstown Corporation

FREDERICK C. HAVARD (Argued)
Supervising Attorney
MARILYN O'ROURKE, Attorney
National Labor Relations Board
Washington, D.C.  20570

FREDERICK L. FEINSTEIN
General Counsel
LINDA SHER
Acting Associate General Counsel
AILEEN A. ARMSTRONG
Deputy Associate General Counsel

Attorneys for the National Labor

Relations Board

DAVID I. GOLDMAN (Argued)
Assistant General Counsel
United Steelworkers of America
Five Gateway Center
Pittsburgh, PA  15222

Attorney for Intervenor

---

OPINION OF THE COURT

---

ALITO, Circuit Judge:

Johnstown Corporation ("Johnstown") and Stardyne, Inc. ("Stardyne") have petitioned for review of an order of the National Labor Relations Board ("the Board"), holding that they violated Section 8(a)(1) and (5) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1) and (5), and the Board has cross-petitioned for enforcement of its order.  The Board's order was predicated on the conclusion that Johnstown and Stardyne were "alter egos."  In reaching this conclusion, the Board did not disturb a finding by the administrative law judge ("ALJ") that Stardyne was not created to evade Johnstown's responsibilities under the Act.  In addition, the Board found it unnecessary to decide whether Johnstown and Stardyne constituted a "single employer."

In their petition for review, Johnstown and Stardyne contend, first, that the Board's conclusion that they are alter egos is inconsistent with the ALJ's undisturbed finding that

Stardyne was not created for the purpose of evading Johnstown's obligations under the Act.  We disagree with this argument.  Johnstown and Stardyne next argue that the Board's holding on the alter ego question is not supported by substantial evidence.  Again, we disagree.  Finally, Johnstown and Stardyne contend that the Board's alter ego holding is inconsistent with Board precedent to the effect that the alter ego doctrine is a "subset" of the single employer doctrine.  We find this argument meritorious.  We therefore grant the petition for review in part, and we deny the Board's cross-petition for enforcement in part.  We remand to the Board for clarification of its precedents concerning the relationship between the alter ego and single employer doctrines.

## I.

In 1988, Johnstown, a manufacturer of steel products, established an innovative laser welding operation at its main facility in Johnstown, Pennsylvania.  Scientists affiliated with Pennsylvania State University headed the project, and Johnstown also assigned ten of its production and maintenance employees to work on the laser operation.  These employees were members of a bargaining unit represented by the United Steelworkers of America (the "union"), and they continued to be covered by Johnstown's collective bargaining agreement with the union when they were transferred to the laser operation.

By 1989, the laser operation was experiencing significant financial problems.  Although Johnstown believed that the

operation could become profitable, the company was not prepared to spend any more money on it. Moreover, the scientists who were working on the project were demanding a share of the operation. In order to address these problems, Johnstown decided to sell the laser operation for approximately $2,550,000 to Stardyne, a newly created corporation that was jointly owned by Johnstown and officers of the new company.[1] To finance the purchase, Stardyne borrowed three million dollars. After the arrangements for the spin-off had been made, management representatives met with the Johnstown production and maintenance employees who were interested in continuing to work on the laser operation. All but one of these employees accepted a job with Stardyne, but under terms different from those contained in Johnstown's collective bargaining agreement.

After learning that management had negotiated directly with and hired production and maintenance employees from Johnstown, the union wrote a letter to Stardyne requesting that Stardyne recognize the union as the collective bargaining representative for these employees. Stardyne, however, refused this request, and the union filed unfair labor practice charges with the Board. In response to these charges, the General Counsel filed a complaint alleging that Johnstown and Stardyne were a "single employer" and/or "alter egos," or at a minimum, that Stardyne was

---

[1]. Shares of Stardyne were distributed at this time as follows: 40% to Johnstown; 20% to Jack Sheehan (Chairman of the Board and majority stockholder in Johnstown); 20% to Ed Sheehan (Jack Sheehan's brother and CEO of Stardyne); and 20% to Stardyne's other officers.

a "successor" to Johnstown. The complaint charged that Johnstown and Stardyne had violated Section 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1) and (5), by bargaining individually with employees represented by the union, by imposing new working conditions on these employees, and by repudiating its collective bargaining agreement with the union.

After notice and a hearing, an ALJ held that Johnstown and Stardyne were guilty of the unfair labor practices charged in the complaint. The ALJ turned first to the question whether Johnstown and Stardyne constituted a single employer or alter egos. When two entities are found to be a single employer, one entity's collective bargaining agreement covers the other entity as well, provided that the two entities' employees constitute a single appropriate bargaining unit. See South Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Engineers, 425 U.S. 800, 805 (1976). However, if two entities are found to be alter egos, a collective bargaining agreement covering one entity is automatically deemed to cover the other. Howard Johnson Co. v. Detroit Local Joint Executive Bd. Hotel & Restaurant Employees, 417 U.S. 249, 259 n.5 (1974); NLRB v. Omnitest Inspection Services, Inc., 937 F.2d 112, 122 (3d Cir. 1991).

The ALJ listed the determinative criteria for a single employer finding as "interrelations of operations, common management, centralized control of labor relations and common ownership." 313 N.L.R.B. 170, 178 (1993). The ALJ found that there was common ownership but no interrelation of operations, and he found that the evidence was unclear regarding the

participation of Johnstown's management in day-to-day operations and labor relations decisionmaking at Stardyne. Id. at 180. On balance, the ALJ refused to hold that Johnstown and Stardyne were a single employer.

By contrast, the ALJ found that Johnstown and Stardyne were alter egos. The ALJ observed that "[t]he Board's criteria for finding that two entities are alter egos are somewhat broader than its standards for finding a single employe relationship." Id. In addition to the factors considered in deciding whether two entities constitute a single employer, the ALJ noted, other relevant factors in making an alter ego determination include "substantially identical business purposes, operations, equipment, customers and supervision." Id. "A further consideration," the ALJ noted, "is whether the new company was created `to evade responsibilities under the Act.'" Id. (quoting Fugazy Continental Corp., 265 N.L.R.B. 1301 (1982)). In this case, the ALJ found that Johnstown and Stardyne had substantially identical ownership, business purposes, operations, equipment, customers, supervision, and employees. Id. The ALJ refused to find that Stardyne was created to evade Johnstown's obligations under the Act,[2] but the ALJ nevertheless concluded,

---

[2]. The ALJ stated:

> When Stardyne went into operation at the end of that year, twelve of [Johnstown's] 390 employes were employed by Stardyne. It seems illogical to me that Johnstown would have staged such an elaborate charade, involving the borrowing of $3,000,000; considerable investment in time and money by the Ed Sheehans, father and son, who became officers in Stardyne and by Jack Sheehan, who became a director; what must have

based on the totality of the factors, that Johnstown and Stardyne were alter egos.  Id. at 181.  Relying on these same factors, the ALJ also concluded that Stardyne was Johnstown's successor and was therefore obligated to recognize and bargain with the union that represented Johnstown's employees.[3]  Id.

Turning to the substance of the charges in the complaint, the ALJ held that the two companies had violated Section 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1) and (5), when management representatives bypassed the union, dealt directly with the Johnstown employees assigned to the laser project, and induced them to enter into separate employment agreements.  The ALJ further held that the companies had violated Section 8(a)(1) and (5) by unilaterally altering these employees' working conditions.  The ALJ therefore recommended that the companies be ordered to recognize and bargain with the union, to abide by the

(..continued)
> been substantial sums of money paid to accountants, bankers and lawyers to set up the new corporation, arrange for loans and bank accounts, incorporate Stardyne and draft numerous documents such as agreements of purchase and sale, and, complex long-term lease, where in the end, the object was to carve out a unit of twelve or so people from the bargaining unit.  Whatever long-term goals Johnstown may have envisioned for Stardyne, or may have now, it does not seem to me to have been a businesslike decision to incur all of these expenses for such a meager result.

313 N.L.R.B. at 180-81.

[3].  A successor, although not bound by its predecessor's collective bargaining agreement, is required to recognize and bargain with the union that represented its predecessor's employees.  NLRB v. Burns Int'l Security Servs. Inc., 406 U.S. 272, 281 (1972); Systems Management Inc. v. NLRB, 901 F.2d 297, 301 (3d Cir. 1990).

terms of the collective bargaining agreement, and to reimburse any employees who had been injured as a result of any failure to abide by this agreement. Id. at 183.

Both Johnstown and Stardyne filed exceptions to the ALJ's decision with the Board, but the Board adopted the ALJ's recommended order. The Board concluded that it was unnecessary to review the ALJ's determination that Johnstown and Stardyne were a single employer, because the ALJ was correct in finding that "Stardyne is a successor to Johnstown [] as well as an alter ego." Id. at 171. The Board so held even though it agreed with the ALJ that "there [was] not sufficient evidence to establish that Stardyne was created so that Johnstown could `evade responsibilities under the Act.'" Id. (citation omitted).

Johnstown and Stardyne independently petitioned this court for review, and the Board filed a cross-application for enforcement of its order. In their petitions for review, the companies each argue that they cannot be alter egos as a matter of law because the Board expressly found that Stardyne was not created to evade responsibilities under the National Labor Relations Act. They also argue that the Board's finding that they were alter egos is not supported by substantial evidence. Last, Johnstown and Stardyne argue that under established Board precedent, the ALJ's undisturbed finding that they were not a single employer precluded a finding that they were alter egos. They do not contest the Board's conclusion that Stardyne was Johnstown's successor.

## II.

A. Application of the National Labor Relations Act to cases involving a reorganization of an employer has proven to be vexing. In order to deal with such cases, the Board developed its alter ego doctrine, which was first recognized by the Supreme Court in Southport Petroleum Co. v. NLRB, 315 U.S. 100, 106 (1942).

In Southport, after the Board had issued a remedial order against a company, the company was dissolved and reorganized, and the Board then sought enforcement against the new corporation. The new shareholders sought dismissal of the order because the predecessor company had been dissolved, but the Supreme Court rejected their claims, noting that "[w]hether there was a bona fide discontinuance and a true change of ownership--which would terminate the duty of reinstatement created by the Board's order--or merely a disguised continuance of the old employer . . . is a question of fact to be resolved by the Board . . . ." Id. As the Court later explained in Howard Johnson, 417 U.S. at 259 n.5:

> [Alter ego] cases involve a mere technical change in the structure or identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management. In these circumstances the courts have had little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of its predecessor.

Following Southport and Howard Johnson, the Board, in Crawford Door Sales Co., 226 N.L.R.B. 1144 (1976), enunciated seven objective factors that it has consistently applied in evaluating whether two companies are alter egos. These factors

are whether "the two enterprises have `substantially identical' management, business purpose, operation, equipment, customers, and supervision, as well as ownership." Id. The Board does not require the presence of each factor to conclude that alter ego status should be applied. See, e.g., Fugazy Continental Corp., 265 N.L.R.B. at 1301-02.

B. A major issue in this case is whether the Board, when it seeks to apply the alter ego doctrine, must find that the change in ownership was motivated by an intent to avoid obligations under the National Labor Relations Act. This issue has yielded no consensus among the courts of appeals that have considered it.[4] The Board, however, does not require a finding

[4]. Generally, the circuits have taken three different approaches. See generally Gary MacDonald, Labor Law's Alter Ego Doctrine: The Role of Employer Motive in Corporate Transformations, 86 Mich. L. Rev. 1024, 1039-52 (1988) (surveying the positions taken by the courts of appeals). Both the First Circuit and Eighth Circuits have held that illicit intent is the critical inquiry in an alter ego determination. Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 24 (1st Cir.), cert. denied, 464 U.S. 892 (1983); Iowa Express Distribution, Inc. v. NLRB, 739 F.2d 1305, 1311 (8th Cir.), cert. denied, 496 U.S. 1088 (1984). The Second, Fifth, Sixth, Seventh, Ninth, and District of Columbia Circuits have held that intent is not essential to the imposition of alter ego liability but is a factor that the Board may take into consideration. Goodman Piping Prods. v. NLRB, 741 F.2d 10, 11 (2d Cir. 1984); Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc. 690 F.2d 489, 508 (5th Cir. 1982), cert. denied, 464 U.S. 932 (1983); NLRB v. Allcoast Transfer, Inc., 780 F.2d 576, 581 (6th Cir. 1986); NLRB v. Bell Co., 561 F.2d 1264, 1268 n.4 (7th Cir. 1977); Tanaka Constr., Inc. v. NLRB, 675 F.2d 1029, 1033 (9th Cir. 1982); NLRB v. Tricor Prods., 636 F.2d 266, 270 (10th Cir. 1980); Fugazy Continental Corp. v. NLRB, 725 F.2d 1416, 1419 (D.C. Cir. 1984). Finally, the Fourth Circuit has adopted a "reasonably foreseeable benefit" standard that focuses on "whether the transfer resulted in an expected or reasonably foreseeable benefit to the old employer related to the elimination of its labor obligations." Alkire v. NLRB, 716 F.2d 1014, 1019-20 (4th Cir. 1983).

of "intent to evade responsibilities under the Act," but treats such intent as an additional factor to be considered (in addition to the Crawford Doors factors) when determining alter ego status. See, e.g., Hiysota Fuel Co., 280 N.L.R.B. 763, 763 n.2 (1986); Fugazy Continental Corp., 265 N.L.R.B. at 1301; Advanced Electric, Inc., 268 N.L.R.B. 1001, 1002 (1984).

In deciding whether the Board's position should be sustained, we apply the standards set out by the Supreme Court in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). See ABF Freight Systems, Inc. v. NLRB, 114 S. Ct. 835, 839 (1994); Lechmere, Inc. v. NLRB, 112 S. Ct. 841, 847-48(1992); Resorts Int'l Hotel Casino v. NLRB, 996 F.2d 1553, 1555 (3d Cir. 1993). We first ask "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter." Id. If it is not, we may not "simply impose [our] own construction on the statute." Id. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the
(..continued)

The commentators who have discussed this issue are also divided. Compare Frederick Slicker, A Reconsideration of the Doctrine of Employer Successorship--A Step Toward a Rational Approach, 57 Minn. L. Rev. 1051, 1064 (1973) (arguing for an intent based standard); Comment, Bargaining Obligations After Corporate Transformations, 54 N.Y.U. L. Rev. 624, 638 (1979) (same) with Stephen Befort, Labor Law and the Double Breasted Employer: A Critique of the Single Employer and Alter Ego Doctrines and a Proposed Reformulation, 67 Wisc. L. Rev. 67, 101 (1987) (arguing against requiring intent); Gary MacDonald, Labor Law's Alter Ego Doctrine: The Role of Employer Motive in Corporate Transformations, 86 Mich. L. Rev. 1024, 1056 (1988) (same).

question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843; see Pauley v. Bethenergy Mines, Inc., 111 S. Ct. 2524, 2534 (1991).

In the present case, it is clear that Congress has not "directly spoken to the precise question at issue." Chevron, 467 U.S. at 842. Section 8(a) of the National Labor Relations Act, 29 U.S.C. § 158(a), makes it an unfair labor practice for an "employer" to engage in certain practices, including those charged in this case, i.e., interfering with employees in the exercise of their rights under Section 7 of the Act, 29 U.S.C. § 157, and refusing to bargain with their employees' representatives. 29 U.S.C. § 158(a)(1) and (5). Section 2(2) of the Act, 29 U.S.C. § 152(2), defines the term "employer" broadly, stating that it "includes any person acting as an agent of the employer, directly or indirectly . . . ," and the use of the term "includes" clearly indicates that this definition was not meant to be comprehensive. Therefore, the language of the Act does not dictate the definition of an alter ego.

The Board, however, is charged with the responsibility of interpreting and enforcing the Act. NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 786-87 (1990); NLRB v. Erie Resistor Corp., 373 U.S. 221, 236 (1963). Thus, the Board's alter ego policy is properly viewed as a gap-filling measure, adopted through case-by-case adjudication, to flesh out the concept of an "employer" under the relevant provisions of the

Act.[5]  See Morton v. Ruiz, 415 U.S. 199, 231 (1974) ("The power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress")

Although the Act does not compel the Board's alter ego test, we defer to that test because it is consistent with the purposes and policies of the Act. See Omnitest, 937 F.2d at 118. We recognize the "Board's special function of applying the general provisions of the Act to the complexities of industrial life."  Erie Resistor, 373 U.S. at 236; see 29 U.S.C.A. § 156. In the present context, determining the role of intent in alter ego analysis involves a policy choice requiring a balancing of, on the one hand, an employer's "freedom to contract . . . includ[ing] the right to transfer its assets, reorganize its business or close a portion thereof without imposing on its vendee the obligation to adopt its labor contract," Scott, 612 F.2d at 789 (Sloviter, J., dissenting), and, on the other, the desire to protect employees from "sudden change[s] in the employment relationship," John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543 (1964), and to "prevent employers from evading

---

[5].  See In re Goodman, 873 F.2d 598, 602–03 (2d Cir. 1989) (holding that the question of whether an employer is an alter ego of a prior employer for purposes of liability under the Act is a "question of substantive federal labor law" to be determined by the Board).

obligations under the Act by merely changing or altering their corporate form." Allcoast, 780 F.2d at 582.[6]

We view the Board's resolution of this conflict as consistent with the Act. First, it can be argued that the Board's policy, which relies primarily on an examination of objective criteria, provides for easier and more consistent application of the Act than one in which intent is an essential element. It may be difficult to determine intent when there are facially legitimate business reasons that support a change in corporate form. See Allcoast, 780 F.2d at 582. Accordingly, the Board's objective test arguably serves to prevent "industrial strife and unrest," 29 U.S.C. § 151, by restricting the ability of employers to use a pretext in order to avoid their labor obligations. Second, the Board's policy can be defended on the ground that it provides a degree of protection for the legitimate expectations of workers who enter into a collective bargaining agreement with the understanding that it will continue to apply so long as they are working for what they regard as the "same" employer. It can also be argued that the Board's policy furnishes this protection while at the same time generally

_____

[6]. As the Supreme Court in United States v. Shimmer, 367 U.S. 374, 383 (1961), made clear, it is the agency's prerogative to choose between two competing, justifiable policy considerations:

> If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute . . . that the accommodation is not one that Congress would have sanctioned.

permitting changes in ownership of employers without saddling the successor with collective bargaining agreements to which they did not agree. See Burns, 406 U.S. at 281-82.[7], In this way, the Board's rule can be said to promote the Act's goal of encouraging the use of collective bargaining arrangements as a way to balance economic bargaining power.[8] See 29 U.S.C. § 151. In short, while we are by no means sure that we would select the Board's test if we were choosing on our own, we find that test to be a permissible construction of the Act.

C. Johnstown and Stardyne argue that the Board's interpretation of the Act is not controlling because our court has already held that intent is a necessary element in an alter ego determination. A careful review of the law of this circuit, however, indicates that we have not definitively resolved this issue.

Our court first addressed the role of intent in this context in NLRB v. Scott Printing Corp., 612 F.2d 783 (3rd Cir. 1979). In that case, Scott Printing sold one portion of its business, the composing room, to two employees, id. at 785, and a divided panel of our court sustained the Board's conclusion that the new company was an alter ego of the original company and was

---

[7]. Nor does the Act prevent an employer from going out of business. See Textile Workers Union v. Darlington Manufacturing Co., 380 U.S. 263, 272 (1965).

[8]. The reasonableness of the Board's policy is further supported by the fact that it has been adopted by the majority of the circuits that have addressed the issue. See supra note 4.

therefore obligated under the Act to assume its collective
bargaining obligations, id. at 788-89.  In support of its
holding, the majority noted that operation of the composing room
remained unchanged after the sale, that no rent was paid, and
that there was substantial intermingling in the use of supplies
and support staff.  Id. at 787-88.  As for the requirement of
intent, the majority stated: "Assuming without deciding in this
case the General Counsel must prove that Scott Printing intended
to evade its duty to bargain, we find that there is substantial
evidence to support the ALJ's conclusion."  Id. at 787 (emphasis
added).  Thus, although Judge Sloviter argued vigorously in
dissent that antiunion animus or an intent to evade labor
obligations is required to support a finding that two entities
are alter egos, id. at 790, the majority did not reach this
question.

    Our court again found it unnecessary to resolve this
question in NLRB v. Al Bryant, Inc., 711 F.2d 543 (3rd Cir.
1983), cert. denied, 464 U.S. 1039 (1984).  There, we affirmed a
Board decision holding that two construction companies were alter
egos.  Id. at 554.  We noted the presence of objective factors
indicative of alter ego status, such as shared space, assumption
of debts, and the employment of the same workers.  Id.  As for
intent, we noted:  "[I]t is significant, if not crucial, that
[the successor company] was created after the filing of unfair
labor practice charges against the [predecessor companies] . . .
."  Id. (emphasis added).

We again discussed the alter ego question in <u>NLRB &</u>

<u>Omnitest Inspection Services, Inc.,</u> 937 F.2d 112 (3rd Cir. 1991),

where we upheld the Board's determination of alter ego status

based on the substantial identity of the two businesses.  On the

question of intent, we first stated:

> For an alter ego relationship to exist, a purpose to
> avoid the old employer's labor obligations under a
> collective bargaining agreement or under the Act must
> underlie the formation of the new employer.  <u>Fugazy</u>
> <u>Continental Corp.,</u> 265 N.L.R.B. at 1302.

<u>Id.</u> at 118.  While this statement appears to support the argument

advanced by Johnstown and Stardyne in this case, we do not

interpret <u>Omnitest</u> as having conclusively resolved the question

at issue.  It is noteworthy that the previously quoted statement

from the <u>Omnitest</u> opinion was supported solely by a citation to

<u>Fugazy Continental Corp.,</u> 265 N.L.R.B. at 1302.  In <u>Fugazy</u>

<u>Continental Corp.,</u> after reviewing the objective factors that

must be considered in making an alter ego determination, the

Board added:

> <u>We must also consider</u> whether the purpose behind the
> creation of the alleged <u>alter ego</u> was legitimate or
> whether, instead, its purpose was to evade
> responsibilities under the Act.

265 N.L.R.B. at 1302 (emphasis added) (footnote omitted).

Moreover, other language in the <u>Omnitest</u> opinion suggests that no

single factor is essential to a determination that two entities

are alter egos.  After listing the factors that are relevant, the

court wrote:

> None of these factors, however, "taken alone, is the
> sine qua non of alter ego status."  <u>Fugazy Continental</u>
> <u>Corp.,</u> 265 N.L.R.B. at 1301-02; <u>Woodline Motor</u>

> Freight, 278 N.L.R.B. at 1231, <u>enforced in relevant</u> <u>part</u>, 843 F.2d at 288-89. Instead, the sum total of the factors, viewed together, help determine whether the two employers are "`the same business in the same market.'" <u>Fugazy Continental Corp.</u>, 265 N.L.R.B. at 1301-02 (quoting <u>International Harvester Co. & Muller</u> <u>International Trucks, Inc.</u>, 247 N.L.R.B. 791, 798 (1980)).

937 F.2d at 118. Later, the court reiterated:

> As we have explained, no one factor, "taken alone, is the sine qua non of alter ego status." <u>Fugazy</u> <u>Continental Corp.</u>, 265 N.L.R.B. at 1301-02.

<u>Id.</u> at 121. These statements, coupled with the court's repeated reliance on <u>Fugazy Continental Corp.</u>, suggest that the court did not intend to go beyond the proposition endorsed by the Board in <u>Fugazy Continental Corp.</u>, <u>viz.</u>, that an intent to evade responsibilities under the Act is a factor that must be considered.

Furthermore, we believe that the <u>Omnitest</u> court's holding -- that the Board's alter ego finding was supported by substantial evidence -- is consistent with this interpretation. The Board's finding was based on numerous factors (including an intent to evade obligations under the Act), and our court found that the Board's findings concerning these multiple factors were supported by substantial evidence. Nothing in our opinion, with the possible exception of the first statement quoted above, suggests that the finding of an intent to evade responsibilities under the Act was critical to our holding. For all of these reasons, we do not interpret <u>Omnitest</u> as binding circuit precedent for the

proposition that an alter ego relationship cannot exist without an intent to escape obligations under the Act.

We most recently referred to the alter ego doctrine in Eichleay Corp. v. International Assoc. of Bridge, Structural and Ornamental Iron Workers, 944 F.2d 1047 (3d Cir. 1991), cert. dismissed, 112 S. Ct. 1285 (1992). Eichleay Corporation, a union shop construction company, was a signatory to nationwide collective bargaining agreements known as NMAs. After a non-union shop subsidiary, Eichleay Constructors, Inc. ("ECI"), entered into a joint venture to renovate a steel mill, several unions filed grievances against Eichleay, claiming that it was performing work on the renovation project in violation of the NMAs. The arbitration panel issued awards in favor of the unions, finding that Eichleay was "present at the project" and was obligated to apply the NMAs to work performed on the project. See 944 F.2d at 1054-55, 1058 n.11; Eichleay App. at 461-62. The district court vacated the awards, but we directed that they be confirmed in part.

We interpreted part of the awards to be based on the theory that the NMAs impliedly required Eichleay to refrain from setting up another "corporation to which it transferred work to avoid the [NMAs]." 944 F.2d at 1058 (citation omitted). Applying the "extremely deferential" standard employed in reviewing arbitration awards, id. at 1059, we held that there was sufficient evidence to support the portion of the awards based on this theory, id. at 1059-60. Thus, in Eichleay we sustained an arbitration award based on the breach of an implied contractual

obligation.  In reviewing this award, it was not necessary to interpret or apply the National Labor Relations Act or the alter ego doctrine that the Board has developed pursuant to the Act.

Nevertheless, apparently because the contract question at issue implicated the nature of the relationship between Eichleay and ECI, our opinion discussed the Board's alter ego doctrine, and in the course of that discussion our opinion made several statements that appear to support the view that the Board cannot find an alter ego relationship unless the employer intended to evade its obligations under the Act.  We stated:

> The ultimate focus of alter ego analysis, however, is "the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or a technical change in operations."

944 F.2d at 1059 (quoting Al Bryant, 711 F.2d at 553) (quoting Carpenters Local, 690 F.2d 489 at 508).  Moreover, after noting that the Board, in an order not under review by our court, had held that Eichleay and the ECI were a single employer, we said:

> The additional finding required for alter ego status, that the second company be formed to avoid the responsibilities of the first company's collective bargaining agreement, is also supported in this case.

944 F.2d at 1060.

Although these statements seem to support the arguments advanced by Johnstown and Stardyne here, we do not regard them as controlling, since they were clearly dicta rendered in a substantially different context.  While it is a tradition of our court that one panel may not overrule a decision of a prior panel, that does not mean that important questions, such as the

one before us, should be decided based on dicta such as the statements quoted above.

We therefore find that the Board's construction of the Act is not in conflict with any prior decision of our court, and since the Board's interpretation of the Act is reasonable, it should be accorded deference.

## III.

We now consider whether the record supports the Board's application of its policy to the facts of the case. The determination whether two companies are alter egos is a question of fact for the Board, Southport, 315 U.S. at 106, and we must, of course, accept the Board's factual determinations and reasonable inferences derived from factual determinations if they are supported by substantial evidence. 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Scott, 612 F.2d at 787; NLRB v. Eagle Material Handling, Inc., 558 F.2d 160, 164 n.6 (3d Cir. 1977). Consequently, we are not free to substitute our view of the record even if we would have reached different conclusions on de novo review. Universal Camera, 340 U.S. at 488.

As discussed above, in order to determine whether there has been a true change in ownership or merely a disguised continuance, the Board looks to whether the new and old employers share "'substantially identical' management, business purpose, operation, equipment, customers, and supervision, as well as ownership." Crawford Doors, 226 N.L.R.B. at 1144. In addition,

as noted, an intent to evade the Act is an important, but not an essential, factor. See, e.g., Hiysota Fuel, 280 N.L.R.B. at 763 n.2. The main focus of the inquiry is to determine whether the two employers are the same business in the same market. International Harvester Co. & Muller Int'l Trucks, Inc., 247 N.L.R.B. 791, 798 (1980).

We find that there is substantial evidence on the record to uphold the Board's conclusion that most of the Crawford Doors factors are present in this case. Although the record does not indicate that Johnstown actually managed Stardyne after the spin-off, the record does support the Board's finding of a continuity in the management and supervision of the laser operation. Several Stardyne managers, including Stardyne's president, managed the laser operations at Johnstown. See Al Bryant, 711 F.2d at 554 (alter ego finding where old managers continued to perform same function in new company).

The Board's finding of a continuity of business purpose is also supported in the record. Although Stardyne argues that laser production took a more commercial focus under its leadership, the record supports the Board's view that this was a basic purpose of the facility under Johnstown. Likewise, the Board's conclusion that a substantial identity of operation existed is also supported in the record. The record clearly indicates that the day-to-day operation of the laser remained nearly unchanged after the transition. As to identity of equipment, the record indicates that Stardyne used mostly the same equipment, except for one new laser, as was used at the

Johnstown facility and that Stardyne's operation is located in the exact same place where Johnstown operated the laser facility.[9] See Omnitest, 937 F.2d at 117 (alter ego finding when new business stayed in the same location). The record also indicates an overlap in customer base between the two operations. Finally, the Board correctly concluded that Johnstown and Stardyne had substantially identical ownership since Johnstown owned 40% of Stardyne and Jack Sheehan, Johnstown's principal stockholder, also owned 20% of Stardyne. App. 171-72, 480-81; see Scott Printing, 612 F.2d at 786 (alter ego finding where previous owners retained substantial control after sale of business); see also Haley & Haley, Inc., 289 N.L.R.B. 649, 652 (1988), enforced 880 F.2d 1147 (9th Cir. 1989) (substantial identity of ownership found in parent-subsidiary relationship). Thus, although there was no finding that Johnstown exercised centralized control over the management of Stardyne, the remainder of the Crawford Doors factors are supported by the record. The lack of an intent to evade obligations under the Act, weighs against a finding of alter ego status. Nevertheless, the record as a whole contains substantial evidence supporting the Board's alter ego finding.

---

[9]. The record also indicates that Stardyne used Johnstown's address and retained its previous telephone number.

**IV.**

The companies' final argument is that Board precedent prevents a finding of alter ego status because of the ALJ's undisturbed finding that the companies were not a single employer.[10] In making this argument, the companies rely on the Board's decision in Gartner-Harf Co., 308 N.L.R.B. 531, 533 n.8 (1992), which stated that "in Board law, alter ego is in effect a subset of the single employer concept . . . ." The companies argue that because they do not constitute a single employer, they cannot be alter egos.

Putting aside Gartner-Harf, we see no reason why the alter ego doctrine must be considered a subset of the single employer doctrine. Although these two doctrines are related, the Board has traditionally taken the position that they are distinct, see, e.g., Dahl Fish Co., 279 N.L.R.B. 1084, 1086 (1986). See also Al Bryant, 711 F.2d at 551. See generally Iowa Express, 739 F.2d at 1310 (explaining difference between the two doctrines).[11] The single employer doctrine generally applies to situations where two entities concurrently perform the same function and one

_____

[10]. The Board did not reach the ALJ's single employer determination because it found that the ALJ's alter ego finding was sufficient to support the ALJ's order. 313 N.L.R.B. at 170.

[11]. Another difference between the two doctrines is that a finding that two employers are a single employer does not end the analysis. The two groups of employees must still be determined to be an appropriate single unit in order for the collective bargaining agreement of one to apply to the other. See, e.g., South Prairie Constr., 425 U.S. at 805.

entity recognizes the union and the other does not. Gilroy Sheet Metal, 280 N.L.R.B. 1075 n.1 (1986); Iowa Express, 739 F.2d at 1310; Carpenters Local, 690 F.2d at 508. In making a single employer determination, the Board uses four criteria: interrelation of operations, common management, centralized control of labor relations, and common ownership. See Radio & Television Broadcast Technicians Local 1264 v. Broadcast Serv. of Mobile, Inc., 380 U.S. 255, 256 (1965) (per curiam); Al Bryant, 711 F.2d at 554; see generally McDonald, supra at 1033 n.66. The alter ego doctrine, by contrast, examines seven objective criteria plus intent and usually comes into play when a new legal entity has replaced the predecessor (or at least the unionized portion of the predecessor). See Howard Johnson, 417 U.S. at 259 n.5.

While we are thus unsure why the alter ego should be regarded as a subset of the single employer doctrine, the Board in Gartner–Harf appears to have so held. Gartner–Harf involved the question whether a company was the alter ego of the entities that took over its business. The ALJ found that the company was the alter ego of these entities and, although he indicated that the employers in question could be considered a "single employer," he did not expressly find that they were. 308 N.L.R.B. at 542. The Board reversed the ALJ, explicitly finding that the companies in question were not a "single employer." Id. at 533. The Board noted that the General Counsel had admitted in his brief that "in Board law, alter ego is in effect a subset of the single employer concept (i.e., not all single employers are

alter egos, but all alter egos by definition met [sic] the criteria for single employer status)." Id. at 533 n.8. The Board then disposed of the General Counsel's alter ego claim by stating that it failed "a fortiori" since the companies did not constitute a single employer. Id. However, the Board added: "We also note that the record does not show that the Respondent is merely a disguised continuance of the old employer." Id.

In this case, the Board majority attempted to distinguish Gartner-Harf. Stating that it refused to "engage in extended dicta on theoretical differences between alter ego and single employer concepts," 313 N.L.R.B. at 170 n.3, a majority of the Board asserted that Gartner-Harf did not apply because in Gartner-Harf, unlike this case, the record showed that there was no disguised continuance. Id. Thus, the Board majority, without repudiating Gartner-Harf's teaching concerning the relationship between the single employer and alter ego doctrines, held that Johnstown and Stardyne, although apparently not a single employer, were nevertheless alter egos.

We cannot accept the Board majority's reasoning. If it is true, as Gartner-Harf held, that "all alter egos by definition [meet] the criteria for single employer status," 308 N.L.R.B. at 533 n.8, and if it is true, as the ALJ in this case found, that Johnstown and Stardyne are not a single employer, then it must follow that Johnstown and Stardyne are not alter egos. On the other hand, if Johnstown and Stardyne are alter egos, as the Board held, then either Gartner-Harf's holding with respect to the relationship between the single employer and alter ego

doctrines was wrong or the ALJ's finding that Johnstown and Stardyne are not a single employer was wrong. For these reasons, the Board majority's failure to follow or repudiate Gartner-Harf's teaching is troubling to us, as it was to the Board member who concurred in this case. See 313 N.L.R.B. at 172-73 (Member Raudabaugh, concurring). We are further disturbed by the Board's subsequent decision in Teamsters Local 776, 313 N.L.R.B. 1148 (1994). In that case, the Board affirmed the judgment of an ALJ who explicitly relied on Gartner-Harf's reasoning in deciding a question of alter ego status. Teamsters Local, 313 N.L.R.B. at 1164.

We hold that the Board's failure in this case to follow or repudiate its prior holding in Gartner-Harf was arbitrary and capricious and a violation of the Administrative Procedures Act. 5 U.S.C. § 706(2)(A).[12] It is well established that even when an agency is creating policies to fill a gap in an ambiguous statute, the agency has a responsibility to explain its failure to follow established precedent. Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade, 412 U.S. 800, 807-09 (1973); King Broadcasting Co. v. FCC, 860 F.2d 465, 470 (D.C. Cir. 1988). The

_____

[12]. Section 706 states:

> The reviewing court shall . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be . . .
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

"requirement that the Board provide analysis and findings serves as a prophylaxis against an arbitrary exercise of the Board's power." NLRB v. Armcor Industries, 535 F.2d 239, 245 (3d Cir. 1976) (quoting Walgreen Co. v. NLRB, 509 F.2d 1014, 1018 (7th Cir. 1975)). This not to say that the Board is forever bound by prior precedent, but only that when it departs from controlling precedent, it must present a reasoned explanation for the departure. See NLRB v. J. Weingarten, Inc., 420 U.S. 251, 265-66 (1975) (Board may change policies through evolving case law). As the Supreme Court has explained:

> [An] agency may flatly repudiate those norms, deciding, for example that changed circumstances mean that they are no longer required in order to effectuate congressional policy. Or it may narrow the zone in which the rule will be applied, because it appears that a more discriminating invocation of the rule will best serve some congressional policy. Or it may find that, although the rule in general serves useful purposes, peculiarities of the case before it suggest that the rule not be applied in that case. Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.

Atchison, Topeka & Santa Fe Ry., 412 U.S. at 808.

Here, the Board's explanation for its failure to apply Gartner-Harf fell short of this standard, and we therefore remand this case to the Board so that it can reconcile the contradictory case law that it has developed. We express no view on how this resolution should be made, but hold only that the Board must provide a reasoned explanation for its refusal to apply Gartner-Harf to this case.

## V.

The Board's finding that Stardyne is Johnstown's successor is unchallenged on appeal, and therefore we grant the Board's application to enforce the portion of its order requiring Stardyne to recognize and bargain with the union that represents Johnstown's employees.  See page 8, footnote 3, supra.  Due to the need for a remand on the Gartner-Harf issue, however, we grant the companies' petition for review and deny the Board's petition for enforcement of the remainder of the order, and we remand this case to the Board for further proceedings.